Citation Nr: 1806315 
Decision Date: 01/31/18 Archive Date: 02/07/18

DOCKET NO. 14-27 002 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Salt Lake City, Utah


THE ISSUES

1. Entitlement to service connection for a right eye disability. 

2. Entitlement to a disability rating greater than 10 percent prior to April 10, 2017 and greater than 30 percent beginning April 10, 2017 for osteoarthritis and osteochondritis of the left knee (previously characterized as post-operative residuals, arthrotomy, left knee).

3. Whether a timely notice of disagreement (NOD) regarding a September 2015 denial of additional allowance based on dependency was received.

4. Entitlement to service connection for left foot and left great toe osteoarthritis, claimed as secondary to service-connected left knee disability. 

5. Entitlement to an effective date prior to December 19, 2016 for the assignment of a 70 percent disability rating for bilateral hearing loss.

6. Entitlement to an initial compensable evaluation for surgical scar, status post left knee arthrotomy. 

7. Entitlement to service connection for left hip osteoarthritis, claimed as secondary to service-connected left knee disability. 

8. Entitlement to service connection for right hip osteoarthritis, claimed as secondary to service-connected left knee disability.

9. Entitlement to service connection chin laceration, claimed as secondary to service-connected left knee disability.

10. Entitlement to service connection for lumbosacral spine L4-S1 facet arthropathy, claimed as secondary to service-connected left knee disability.

11. Entitlement to service connection for left hand little finger fracture, claimed as secondary to service-connected left knee disability. 

12. Entitlement to service connection for right knee patellofemoral arthritis, claimed as secondary to service-connected left knee disability. 

13. Entitlement to service connection for right thumb laceration residuals, claimed as secondary to service-connected left knee disability. 

14. Entitlement to total disability based on individual unemployability (TDIU) due to service-connected disabilities.


REPRESENTATION

Appellant represented by: Curtis W. Fetty, Private Attorney


ATTORNEY FOR THE BOARD

April Maddox, Counsel


INTRODUCTION

The Veteran served on active duty from September 1953 to August 1955.

This matter comes before the Board of Veterans' Appeals (Board) on appeal from December 2013, September 2015, April 2017, and July 2017 rating decisions of the Department of Veterans Affairs (VA) Regional Office (RO) in Salt Lake City, Utah. 

The right eye and left knee issues have previously been before the Board on several occasions. Specifically, in April 2015, the Board reopened a previously denied claim of entitlement to service connection for a right eye disability and then remanded the right eye and left knee claims for additional development. In a March 2016 Board decision, the Board denied service connection for a right eye disability and also denied a disability rating greater than 10 percent for post-operative residuals, arthrotomy, left knee. The Veteran appealed these denials to the United States Court of Appeals for Veterans Claims (Court). Pursuant to a Joint Motion for Remand, the Court issued a September 2016 Order vacating the Board's March 2016 decision and remanded the matter for action in compliance with the Joint Motion for Remand. The Board remanded the right eye and left knee issues again in December 2016 for additional development.

By rating decision dated in April 2017, the RO increased the Veteran's disability rating for the left knee from 10 percent to 30 percent disabling effective April 10, 2017. However, as this increase does not represent a total grant of the benefits sought on appeal, the claim for increase remains before the Board both before and after April 10, 2017. AB v. Brown, 6 Vet. App. 35 (1993).
 
This appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c) (2017). 38 U.S.C. § 7107(a)(2) (2014).



FINDINGS OF FACT

1. There is no clear and convincing evidence that a right eye disability pre-existed service and the competent medical evidence of record establishes that any current right eye disability, as likely as not, began during service.

2. Resolving all doubt in his favor, a left foot/toe disorder is related to the Veteran's service-connected left knee disability.

3. Resolving all doubt in his favor, a left hip disorder is related to the Veteran's service-connected left knee disability.

4. Resolving all doubt in his favor, a right hip disorder is related to the Veteran's service-connected left knee disability.

5. Resolving all doubt in his favor, a chin laceration is related to the Veteran's service-connected left knee disability.

6. Resolving all doubt in his favor, a lumbar spine disorder is related to the Veteran's service-connected left knee disability.

7. Resolving all doubt in his favor, a left 5th finger fracture is related to the Veteran's service-connected left knee disability.

8. Resolving all doubt in his favor, a right knee disorder is related to the Veteran's service-connected left knee disability.

9. Resolving all doubt in his favor, a right thumb laceration is related to the Veteran's service-connected left knee disability.

10. As the Veteran's initial 10 percent rating under Diagnostic Code (DC) 5257 for P.O. Residuals, arthrotomy, left knee remained in effect from August 1955 to July 2013, a period well in excess of the 20 years required for protection of that rating, beginning July 1, 2013 (the date of claim for an increased rating), the Veteran is entitled to two separate ratings for his service-connected left knee disability; the protected 10 percent rating under DC 5257 (pertaining to recurrent subluxation or lateral instability of the knee) and the ratings under DCs 5260 and 5261 (pertaining to limitation of flexion and extension) through the application of 38 C.F.R. § 4.59 as assigned by the RO in the December 2013 rating decision under DC 5260. 

11. Prior to April 10, 2017, the Veteran's left knee disability was manifested by painful motion and weakness without compensable limitation of motion.

12. Beginning April 10, 2017, the Veteran's left knee disability has been manifested by painful motion and weakness with limitation of extension to 20 degrees, but without: additional limitation of motion due to pain; weakness, incoordination or fatigue so as to limit flexion to 60 degrees and/or extension to 30 degrees or more.

13. The Veteran's service-connected left knee disability has caused muscle atrophy of the left leg, most nearly approximating no more than a moderate disability.

14. The Veteran has established service connection for bilateral hearing loss, rated 70 percent disabling; osteoarthritis and osteochondritis of the left knee, rated 30 percent disabling; tinnitus, rated 10 percent disabling; and surgical scar, post-operative residuals, arthrotomy associated with osteoarthritis and osteochondritis of the left knee, rated noncompensable; resulting in a combined disability rating of 80 percent.

15. The Veteran's service-connected left knee scar is manifested by subjective complaints of pain. There is no evidence that the scar is deep, unstable, loses its covering repeatedly, covers an area of 144 square inches or greater, or that it adversely affects any function.

16. Resolving all reasonable doubt in the Veteran's favor, the Board finds that he is unable to secure and follow a substantially gainful occupation by reason of service-connected disabilities.

17. Medical and other evidence dated from July 1, 2013 to December 18, 2016 does not demonstrate that the Veteran's service-connected bilateral hearing loss met the requirements for a 70 percent disability rating.

18. On September 18, 2015, the RO mailed notification to the Veteran of its decision denying an additional allowance based on dependency.

19. The Veteran did not submit a VA Form 21-0958, NOD within one year of being notified of the September 2015 decision; a statement received on September 29, 2015, is not a timely NOD.


 CONCLUSIONS OF LAW

1. The criteria for service connection for a right eye disability are met. 38 U.S.C. §§ 1101, 1110, 1111, 1131, 5107 (2014); 38 C.F.R. §§ 3.102, 3.303, 3.304(b) (2017).

2. The criteria for service connection for a left foot/toe disability are met. 38 U.S.C. §§ 1101, 1110, 1131, 5107 (2014); 38 C.F.R. §§ 3.102, 3.303, 3.310 (2017).

3. The criteria for service connection for a left hip disability are met. 38 U.S.C. §§ 1101, 1110, 1131, 5107 (2014); 38 C.F.R. §§ 3.102, 3.303, 3.310 (2017).

4. The criteria for service connection for a right hip disability are met. 38 U.S.C. §§ 1101, 1110, 1131, 5107 (2014); 38 C.F.R. §§ 3.102, 3.303, 3.310 (2017).

5. The criteria for service connection for a chin laceration are met. 38 U.S.C. §§ 1101, 1110, 1131, 5107 (2014); 38 C.F.R. §§ 3.102, 3.303, 3.310 (2017).

6. The criteria for service connection for a lumbar spine disability are met. 38 U.S.C. §§ 1101, 1110, 1131, 5107 (2014); 38 C.F.R. §§ 3.102, 3.303, 3.310 (2017).

7. The criteria for service connection for a left 5th little finger fracture are met. 38 U.S.C. §§ 1101, 1110, 1131, 5107 (2014); 38 C.F.R. §§ 3.102, 3.303, 3.310 (2017).

8. The criteria for service connection for a right knee disability are met. 38 U.S.C. §§ 1101, 1110, 1131, 5107 (2014); 38 C.F.R. §§ 3.102, 3.303, 3.310 (2017).

9. The criteria for service connection for a right thumb laceration are met. 38 U.S.C. §§ 1101, 1110, 1131, 5107 (2014); 38 C.F.R. §§ 3.102, 3.303, 3.310 (2017).

10. As a 10 percent rating under DC 5257 remained in effect for P.O. Residuals, arthrotomy, left knee from August 1955 to July 2013, a period well in excess of the 20 years required for protection of that rating, beginning July 1, 2013 the criteria for a separate 10 percent rating under DC 5257 is warranted. 38 U.S.C. § 1155 (2014); 38 C.F.R. §§ 3.951, 3.952, 4.71(a), DC 5257 (2017). 

11. Prior to April 10, 2017, the criteria for a disability rating greater than 10 percent for osteoarthritis and osteochondritis of the left knee were not met. 38 U.S.C. § 1155 (2014); 38 C.F.R. § 4.71(a), DCs 5003-5261 (2017).

12. Beginning April 10, 2017, the criteria for a disability rating greater than 30 percent for osteoarthritis and osteochondritis of the left knee have not been met. 38 U.S.C. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.321, 4.1-4.7, 4.40, 4.45, 4.71, 4.71a, DCs 5003-5261 (2017).

13. The criteria for a separate 10 percent rating, but no higher, for atrophy of the left leg, as secondary to service-connected post-operative residuals, arthrotomy, left knee have been met. 38 U.S.C. §§ 1155, 5107 (2014); 38 C.F.R. §§ 4.1, 4.3, 4.7, 4.14, 4.21, 4.55, 4.56, 4.73, DC 5314 (2017).

14. The criteria for an initial 10 percent disability rating, and no higher, for surgical scar, status post left knee arthrotomy associated with osteoarthritis and osteochondritis, left knee, have been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 4.1-4.16, 4.118, DC 7805 (2017).

15. The criteria for a TDIU have been met. 38 U.S.C. § 1155 (2014); 38 C.F.R. §§ 3.340, 3.341, 4.16 (2017).

16. The criteria for the assignment of an effective date earlier than December 19, 2016, for the grant of an evaluation of 70 percent disabling for bilateral hearing loss have not been met. 38 U.S.C. § 5110 (2014); 38 C.F.R. §§ 3.1(p), 3.155(a), 3.400, 4.85, DC 6100 (2017).

17. The Veteran's May 2017 NOD as to the September 2009 decision denying an additional allowance based on dependency was not timely. 38 U.S.C. § 7105 (2014); 38 C.F.R. §§ 20.201, 20.302 (2017).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. VA's Duties to Notify and Assist

VA has a duty to provide notification to the Veteran with respect to establishing entitlement to benefits, and a duty to assist with development of evidence under 38 U.S.C. §§ 5103, 5103A (2014); 38 C.F.R. § 3.159(b) (2017).

Upon receipt of a substantially complete application, VA must notify the claimant and any representative of any information, medical evidence, or lay evidence not previously provided to VA that is necessary to substantiate the claim. The notice must inform the claimant: (1) the information and evidence not of record that is necessary to substantiate the claim; (2) the information and evidence that VA will seek to provide; and (3) the information and evidence the claimant is expected to provide. 38 U.S.C. §§ 5103, 5103A, 5107 (2014); 38 C.F.R. § 3.159 (2017); Pelegrini v. Principi, 18 Vet. App. 112 (2004). If VA does not provide adequate notice of any of element necessary to substantiate the claim, or there is any deficiency in the timing of the notice, the burden is on the claimant to show that prejudice resulted from a notice error, rather than on VA to rebut presumed prejudice. Shinseki v. Sanders, 129 S.Ct. 1696 (2009). 

With regard to the service connection issues and the TDIU issue decided below, the Board notes that such issues have been granted so there is no need to discuss VA's duties to assist and notify. 

With regard to the earlier effective date and timeliness issues, these arise from a disagreement as to the effective date assigned and whether a timely notice of disagreement was filed. Once a decision awarding benefits and an effective date has been made, section 5103(a) notice is no longer required because the claim has already been substantiated. As such, there is no need to discuss VA's duties to assist and notify as it pertains to these issues. 
 
With regard to the left knee issue, the Board finds that any defect with regard to the timing or content of the notice to the appellant is harmless because of the informative notices provided throughout the adjudication, including in a March 2014 letter, and because the appellant had a meaningful opportunity to participate effectively in the processing of the claim with an adjudication of the claim by the RO subsequent to receipt of the required notice. The Board considers it significant that the statements made by the Veteran and his representative in written form suggest actual knowledge of the elements necessary to substantiate the claim for an increased rating. Dalton v. Nicholson, 21 Vet. App. 23 (2007) (actual knowledge is established by statements or actions by the claimant or the claimant's representative that demonstrate an awareness of what is necessary to substantiate a claim). The record does not show prejudice to the appellant, and the Board finds that any defect in the timing or content of the notices has not affected the fairness of the adjudication. Mayfield v. Nicholson, 19 Vet. App. 103 (2005); Dingess v. Nicholson, 19 Vet. App. 473 (2006). 

The Veteran has neither alleged nor demonstrated any prejudice with regard to the content or timing of the notice provided. Shinseki v. Sanders, 129 S. Ct. 1696 (2009) (reversing prior case law imposing a presumption of prejudice on any notice deficiency, and clarifying that the burden of showing that an error is harmful, or prejudicial, falls upon the party attacking the agency's determination); Mayfield v. Nicholson, 444 F.3d 1328 (Fed. Cir. 2006). In fact, in a March 2015 letter, the Veteran stated that he waived any defect in the 5103 notice letter.
 
With regard to the scar issue, the Board observes that the Veteran has appealed with respect to the propriety of the initially assigned rating for his left knee scar from the original grant of service connection. VA's General Counsel has held that no VCAA notice is required for such downstream issues. VAOPGCPREC 8-2003, 69 Fed. Reg. 25180 (May 5, 2004). In addition, the Board notes that the Court held that "the statutory scheme contemplates that once a decision awarding service connection, a disability rating, and an effective date has been made, § 5103(a) notice has served its purpose, and its application is no longer required because the claim has already been substantiated." Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006). In this case, the Veteran's claim for service connection for a left knee scar was granted and an initial rating was assigned in the April 2017 rating decision on appeal. Therefore, as the Veteran has appealed with respect to the initially assigned rating, no additional 38 U.S.C. § 5103(a) notice is required as the purpose that the notice is intended to serve has been fulfilled. Hartman v. Nicholson, 483 F.3d 1311 (Fed. Cir. 2007); Dunlap v. Nicholson, 21 Vet. App. 112 (2007). 

With regard to the duty to assist, the Veteran was most recently afforded a VA knee examination in November 2017. In the case at hand, neither the Veteran nor his representative has asserted that this VA examination is inadequate or that such disabilities have worsened since the examination. See 38 C.F.R. § 3.327 (a). Furthermore, there is no objective evidence indicating that there has been an increase in the severity of the Veteran's disabilities since the examination. As such, the Board finds that it is not necessary to remand these claims for the purpose of scheduling new a VA examination.

Also, the Board finds that the AOJ has substantially complied with the Board's December 2016 remand directives. Specifically, the Agency of Original Jurisdiction (AOJ) obtained new VA examinations for the Veteran's left knee in April and November 2017. Therefore, the Board finds that the AOJ has substantially complied with the December 2016 remand directives such that no further action is necessary in this regard. See D'Aries v. Peake, 22 Vet. App. 97, 105 (2008); Dyment v. West, 13 Vet. App. 141, 146-47 (1999) (remand not required under Stegall v. West, 11 Vet. App. 268 (1998), where the Board's remand instructions were substantially complied with), aff'd, Dyment v. Principi, 287 F.3d 1377 (2002).

I. Service Connection Analysis

Service connection may be granted for a disability resulting from disease or injury incurred in or aggravated by service. 38 U.S.C. §§ 1110, 1131; 38 C.F.R. 
§ 3.303(a). Service connection may also be granted for any disease diagnosed after discharge, when all of the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d).

Direct service connection may not be granted without evidence of a current disability; in-service incurrence or aggravation of a disease or injury; and a nexus between the claimed in-service disease or injury and the present disease or injury. Id.; see also Calusa v. Brown, 7 Vet. App. 498, 506 (1995) aff'd, 78 F.3d 604 (Fed. Cir. 1996) [(table)].

Additionally, for Veterans who have served 90 days or more of active service during a war period or after December 31, 1946, certain chronic disabilities, such as arthritis, are presumed to have been incurred in service if manifest to a compensable degree within one year of discharge from service. 38 U.S.C. §§ 1101, 1112; 38 C.F.R. §§ 3.307, 3.309. 

Alternatively, when a disease at 38 C.F.R. § 3.309(a) is not shown to be chronic during service or the one year presumptive period, service connection may also be established by showing continuity of symptomatology after service. See 38 C.F.R. § 3.303(b). The use of continuity of symptoms to establish service connection is limited only to those diseases listed at 38 C.F.R. § 3.309(a). Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013). 

Service connection may be established on a secondary basis for a disability which is proximately due to or the result of service-connected disease or injury. 38 C.F.R. 
§ 3.310(a). Establishing service connection on a secondary basis requires evidence sufficient to show (1) that a current disability exists and (2) that the current disability was either (a) proximately caused by or (b) proximately aggravated by a service-connected disability. Allen v. Brown , 7 Vet. App. 439, 448 (1995) (en banc). 

When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Secretary shall give the benefit of the doubt to the claimant. 38 U.S.C. § 5107; 38 C.F.R. § 3.102; see also Gilbert v. Derwinski, 1 Vet. App. 49, 53 (1990).

1. Right eye disability

The Veteran contends that he incurred a right eye disability during or as a result of service. He specifically contends that his right eye disability did not pre-exist service and was incurred during service, or in the alternative, was aggravated during service. 

Every veteran shall be taken to have been in sound condition when examined, accepted and enrolled for service, except as to diseases or defects noted at the time of the examination, acceptance and enrollment, or where clear and unmistakable evidence or medical judgment is such as to warrant a finding that the disease or injury existed before acceptance and enrollment, and was not aggravated by such service. 38 U.S.C. § 1111; 38 C.F.R. § 3.304(b). 

In Smith v. Shinseki, 24 Vet. App. 40, 45 (2010), the Court clarified that the presumption applies when a Veteran has been "examined, accepted, and enrolled for service," and where that examination revealed no "defects, infirmities, or disorders." 38 U.S.C. § 1111. Plainly, the statute requires that there be an examination prior to entry into the period of service on which the claim is based-here, the second period of active duty. See Crowe v. Brown, 7 Vet. App. 238, 245 (1994) (holding that the presumption of sound condition "attaches only where there has been an induction examination in which the later-complained-of disability was not detected" (citing Bagby v. Derwinski, 1 Vet. App. 225, 227 (1991)).

If a condition is not noted upon entrance into service, then to rebut the presumption of soundness at service entrance VA must show by clear and unmistakable evidence both that there was a pre-existing condition and that it was not aggravated during or by the Veteran's service. Wagner v. Principi, 370 F.3d 1089 (Fed. Cir. 2004); VAOPGCPREC 3-2003 (July 16, 2003). To satisfy this second-prong requirement for rebutting the presumption of soundness, the government must show by clear and unmistakable evidence either that there was no increase in disability during service or that any increase in disability was "due to the natural progression" of the condition. Joyce v. Nicholson, 443 F.3d 845, 847 (Fed. Cir. 2006). 

If a pre-existing disability is noted upon entry into service, then the Veteran cannot bring a claim for service connection for that disability, only a claim for service-connected aggravation of that disability. In that case, 38 U.S.C. § 1153 applies and the burden falls on him, not VA to establish aggravation. Wagner, 370 F.3d at 1096; Jensen v. Brown, 19 F.3d 1413, 1417 (Fed. Cir. 1994).

Service treatment records document that upon enlistment examination in September 1953, the Veteran's eyes were not marked as normal and his vision was measured to be 20/40 in the right eye. He was determined to be qualified for service and was inducted. The Veteran was diagnosed with a traumatic macular hole/macular degeneration in the right eye on October 15, 1953. At the time, his vision in the right eye measured at 20/30. In June 1955, the Veteran reported that his blurry vision in the right eye existed prior to his military service as a result of a football injury. On that examination, his vision was 20/100 on primary central fixation and 20/30 on eccentric fixation and a macular hole was seen. A July 1955 Report of Board of Medical Survey stated that the Veteran reported that upon examination in September 1953, he could not get a sight picture while firing a rifle. According to the report, he further stated that the eye condition existed prior to enlistment and was not aggravated by service. Upon separation in August 1955, the Veteran's right eye vision was measured to be 20/400 uncorrected. 

Post-service private treatment records demonstrate that the Veteran was status post cataract surgery in November 2001 and was subsequently noted with corneal edema with a small opacity in April and June 2012. A corneal endothelial scar and macular hole were noted beginning in December 2006 private treatment records. 

VA treatment records include a November 2014 record with Dr. H.B., which notes the Veteran's reports of blunt trauma from a fist or foot to the right eye in the 1950s. The Veteran reported an immediate decrease in vision at the time of the trauma, that had been relatively stable but with possibly mild worsening vision in the right eye. The physician noted a macular hole by history, although it was not found upon examination at that time. The physician also diagnosed a corneal scar in the right eye, presumably from the blunt trauma in the 1950s. 

The Veteran received a VA examination in October 2013, during which an examiner diagnosed a macular hole, corneal scar, and nuclear sclerotic cataract. The Veteran reported that his vision was blurry when he was in training for shooting during service and that since then, it has worsened. The examiner noted that the service treatment records showed that the Veteran could not see through his targeting sights using his right eye in boot camp. The examiner provided a thorough review of the service treatment records and stated that the likely cause for his "good" visual acuity during the enlistment examination in 1953 was that he was probably using eccentric fixation. 

The examiner stated that while the Veteran did not have any corneal injuries during service, upon examination the examiner found a central corneal endothelial scar that is blocking his central vision. The examiner stated that it was believed that the scar was causing a portion of his visual impairment, but the examiner was unable to assess the degree of impairment. The examiner concluded that the corneal scar must have been incurred after military service. 

Regarding the macular hole, the examiner stated that it was incurred before his military service, which made his vision 20/100 centrally and 20/30 eccentrically. The examination that day did not show a macular hole but some mild RPE changes that could represent a healed macular hole. The examiner explained that often macular holes that persist for a few years before spontaneously healing cause permanent impairment and that this is presumed to be what happened in the Veteran's case from 1953 to 1955. The examiner stated that without an eye examination after military service, it is unknown what his vision possibly improved to because the macular hole apparently healed. As such, the examiner stated that he was unable to establish a baseline and aggravated visual acuity for the macular hole and the subsequent corneal scar. Overall though, the examiner concluded, neither of these conditions was incurred during military service and would not have been aggravated by his military service. The examiner stated that any further opinion cannot be provided except by using mere speculation. 

In September 2015, the VA examiner concluded after re-reviewing the claims file, that the evidence he cited in the October 2013 examination proves that the macular hole/degeneration condition clearly and unmistakably existed prior to active duty. He reiterated that the reason the Veteran's eyesight was found to be so "good" or less impaired at enlistment than at separation, was likely that he was using eccentric fixation upon enlistment. Regarding the cataracts, the examiner stated that the Veteran had cataract surgery a few years prior, that his cataracts were age-related, and that they had nothing to do with his military service. Finally, regarding corneal scarring, the VA examiner stated that per the Veteran's own reports and review of his service treatment records, he did not have any corneal injuries while in service. However, based upon the examination in 2013 as well as private treatment records beginning in 2006, the examiner diagnosed central corneal endothelial scar that is blocking his central vision. The examiner stated that although the date of onset of the corneal scar is unclear, the scar must have been incurred after his military service. 

Pursuant to a Joint Motion for Remand, the parties found that the September 2015 VA opinion did not comply with the April 2015 Board remand instructions, as the September 2015 VA examiner did not provide an adequate rationale for his opinion as to why the Veteran's macular degeneration did not clearly and unmistakably exist prior to service. The parties found that a remand is warranted so that a new VA medical opinion may be obtained to comply with the April 2015 Board remand instruction. 

In a March 2017 addendum opinion, the October 2013 VA examiner specifically opined that it was just as likely as not (50 percent or greater probability)
that the Veteran had a pre-existing eye condition (macular hole with reduced
best corrected visual acuity in the right eye) which clearly and unmistakably
existed prior to military service and was clearly and unmistakably not
aggravated by military service. As rationale for this opinion, the examiner noted that the Veteran had the following right eye conditions: A) pseudophakia (2001), B) central endothelial corneal scar (2006), C,D) macular hole/macular degeneration with reduced best corrected visual acuity (1953 and 1955). With regard to the Veteran's pseudophakia the examiner wrote that the Veteran had cataract surgery and lens implantation in his right eye in 2001. The cataract was due to incidences of aging and was not related to an event prior to or during active duty service
and it was not aggravated during active duty.

With regard to the Veteran's central endothelial corneal scar, the examiner noted that the Veteran did not have a corneal scar on his right eye during service as the corneal scar was first noted in the Veteran's medical records in December 2006 and was noted in subsequent eye examinations in 2007, 2009, and 2010. The corneal scar was thought to be a contributing factor to the Veteran's reduced best corrected vision in his right eye.

With regard to the Veteran's reduced best corrected visual and traumatic macular degeneration, the examiner noted that the Veteran's service treatment records showed a finding of macular hole in the right eye in October 1953, degeneration of macula (hole in macula), right eye, caused by trauma in June 1955, and macular degeneration of the right eye, caused not determined in October 1955. The next available treatment records where his macula was assessed was December 2006, where macular OCT tests showed no evidence of a macular hole or macular degeneration. At that time it was noted that only the foveola was "thinned" in the right eye. All eye examinations following this date do not show any findings of or have a diagnosis of a macular hole or macular degeneration.

With regard to the visual acuity findings made shortly after service entry and the change in visual acuity demonstrated during service, the examiner noted that the Veteran's service treatment records showed that his vision in the right eye was recorded as 20/20 at his induction exam (September 1953), 20/40 with no improvement with pinhole (September 1953), 20/30 (October 1953), 20/100 which improved to 20/30 with eccentric fixation (June 1955), 20/400 at discharge from the military (August 1955), and 20/50 at his VA examination (October 1955). There were no records to review prior to entering the military to validate what his acuity was in the right eye. The examiner found that it was probable that the Veteran had reduced acuity in the right eye due to a macular hole prior to the military and then falsified his acuity so that he would meet the standards for acceptance into the military. The induction examination showed that "Eyes-general and Ophthalomoscopic" were not evaluated as there was no "X" in the normal or abnormal columns whereas all other items are marked with an "X" in the normal column. If the ophthalmoscopic (internal examination with ophthalmoscope) was not done, it was probable that the pre-existing macular hole in the right eye was missed.

Since the visual acuity test is a subjective test, this would be very easy to falsify such as covering the right eye first and seeing the letters with the left eye and then covering the left eye and repeating the same letters for the right eye even though the letters could not really be seen. If the examiner were inexperienced or not paying close attention, this error would easily be missed. One reason for the variability in vision from 20/30 to 20/400 is eccentric fixation. The Veteran admitted in a June 1955 examination that he had a head injury due to athletics (football) at 13 years of age, he could not get a sight picture with firing a rifle in boot camp in September 1953, and that the condition existed prior to enlistment and was not aggravated by service. A macular hole was found in the right eye in October 1953 and again in June 1955 which would cause reduced central vision.

The examiner noted that traumatic macular holes are due to a result of injury from blunt trauma such as a soccer ball to the eye. Traumatic macular holes are more common in pediatric and adolescent populations, and more likely to be found in males.

At the Veteran's eye examination in 1955, the vision in the right eye was 20/100 when looking straight ahead, but improved to 20/30 with eccentric fixation. Upon discharge examination in August 1955, the acuity in the right eye was 20/400 which was worse than any previous acuity test. Again, due to the subjective nature of the visual acuity test and the motive of the Veteran, the test could be easily falsified. The Veteran had potential acuity of 20/40 in his right eye via pinhole in 1953 and showed potential acuity of 20/40 in the right eye with a rigid contact lens fitting in 2017, thus showing stable although reduced vision in the right eye and hence not
aggravated by service.

The examiner also noted that, since service, he underwent cataract surgery, a macular problem of long standing which prohibited him from seeing very clearly in the right eye (April 2002). At his last VA eye examination in October 2013, he stated that he had poor vision in his right eye or blurry vision when he was in training for shooting or when requalifying which had gradually gotten worse. Upon VA eye examination in November 2014, the Veteran stated that his right eye had been giving him problems since 1953. He further stated that he had blunt trauma from a fist or foot to his right eye in the 1950s with an immediate decrease in vision and mildly worsening vision since then. At an eye examination with an outside provider in January 2017, the Veteran reported that he was struck in the right eye while on active duty in the Marine Corps in 1953. At his latest VA eye examination in April 2017, the Veteran said that he thought the macular hole in his right eye was sustained in boot camp and that he has had poor vision since 1955 when he was told it was due to macular hole/macular degeneration. The Veteran said that the
corneal scar popped up in 2006 after he had seen another doctor following cataract surgery.

The examiner noted that the Veteran admitted, in June 1955, to having a head injury prior to service which accounted for his symptoms of reduced vision in the right eye. There was no other medical history or evidence while in the military to support that the veteran had trauma to his eye while in the military. When the macular hole was discovered in the right eye in 1953 while in service, there was no mention of swelling of the eye, ecchymosis of the skin around the eye, blood in the eye, choroidal rupture, retinal tears or commotion retinae that are other trauma related pathologies that can occur at the time of injury.

The examiner noted that spontaneous closure of traumatic macular holes can occur without treatment and that such spontaneous closure tends to occur in younger patients with smaller holes.

The examiner noted that the macular OCT of the right eye showed consistent thinner central thickness in the right eye when compared to the left eye and a deeper central contour than the left eye due to a presumed sealed macular hole in the right eye. Visual acuity was significantly reduced immediately after injury and improved as the macular hole closed. This follows the natural progression of traumatic macular hole. The Veteran did not mention being hit in the right eye by fist or foot while in the military and did not mention it at his last VA eye examination
in 2013 or any of the subsequent eye examinations in between. The examiner noted that the testimony about the fist/foot trauma to his right eye while in the military was not put forth until 2014.

In connection with this claim, the Veteran submitted a January 2017 statement from Dr. L.M.N. Dr. L.M.N. noted that the Veteran had a history of a macular hole in his right eye. Specifically, the Veteran reported being struck in the right eye while on active duty in 1953. Dr. L.M.N. reviewed the Veteran's service treatment records and noted that the Veteran's visual acuity was 20/20 in each eye, without correction for distance, upon enlistment. A subsequent note in his records, dated in October 1953, indicated that his visual acuity dropped to 20/30 in the right eye with a hold in the right macula. This was just a note on a PULHES report. Another record dated in June 1955noted "degeneration of the macular hold in the macula of right eye" thought to be caused by trauma. Following service, in January 2005, the Veteran was found to have an "old residual macular hole in the right eye." While Dr. L.M.N.'s examination of the Veteran's right eye did not show a current open macular hole, "previous medical records are definite." 

Dr. L.M.N. reiterated that the Veteran's visual acuity was 20/20 in both eyes upon enlistment. Subsequently, a macular hole was noted with a decrease in visual acuity to around 20/40 and 20/30. A post service October 1955 VA eye examination also noted a decrease in macular function and a decrease in visual acuity in the right eye to 20/50 with notes as recently as 2005 also suggesting that an old macular hole had existed. Dr. L.M.N. opined that the Veteran's macular hole in the right eye "very likely occurred from an injury during early active duty in the Marine Corp." 

It is the defined and consistently applied policy of VA to administer the law under a broad interpretation, consistent, however, with the facts shown in every case. When, after careful consideration of all procurable and assembled data, a reasonable doubt arises regarding service origin, the degree of disability, or any other point, such doubt will be resolved in favor of the claimant. By reasonable doubt is meant one which exists because of an approximate balance of positive and negative evidence which does not satisfactorily prove or disprove the claim. It is a substantial doubt and one within the range of probability as distinguished from pure speculation or remote possibility. See 38 C.F.R. § 3.102. 

The evidence of record clearly shows that the Veteran entered service in 1953 without any finding of a macular hole in the right eye. The Board is mindful of the service treatment records noting a pre-service injury to the right eye, which suggests that a right eye disability pre-existed service. However, despite the VA medical opinions in this case, there is no clear and convincing evidence that the Veteran's right eye disability pre-existed service. As such, the Board finds that the Veteran's macular hole in the right eye did not pre-exist service. 

Following a complete review of the medical evidence as well as the Veteran's credible testimony and consistent contention that his right eye problems began during service, the Board finds that a right eye disability likely began during service. The evidence is in relative equipoise as the medical evidence shows that the complaints began during service. Accordingly, when resolving all reasonable doubt in favor of the Veteran, service connection for a right eye disability is granted.

2. 
Left foot/toe, left hip, right hip, chin laceration, lumbar spine, left 5th finger laceration, right knee, right thumb laceration

The Veteran contends that a left foot/toe disability, a left hip disability, a right hip disability, chin laceration, a lumbar spine disability, left 5th finger laceration, a right knee disability, and right thumb laceration are secondary to his service-connected left knee disability. With regard to the left foot/toe, left hip, right hip, lumbar spine, and right knee issues, the Veteran contends that such are the result of years of an altered gait due to his left knee disability. With regard to the chin laceration, left 5th finger laceration, and right thumb laceration, the Veteran contends that such are the result of an October 2016 fall caused by his service-connected left knee giving way.

In support of the Veteran's claim, he has submitted an October 2016 private treatment record noting a chin laceration and displaced fracture of the left 5th finger due to a slip and fall. Significantly, VA treatment records show a history of falls beginning in 2016 due to poor balance and a November 2017 VA examination shows that the Veteran experiences instability of the left knee. 

The Veteran has also submitted statements from his private treating physicians. Specifically, in an October 2016 statement, Dr. M.H.L. wrote that he was a certified orthopedic surgeon with a subspecialty in hip and knee replacements as well as hip and knee arthroscopy. Dr. M.H.L. reviewed a June 1955 service treatment record from the Veteran which noted significant limping due to the flexed posture of the Veteran's left knee following a March 1955 surgery of the left knee. Dr. M.H.L. also noted that the Veteran had current diagnoses of mild bilateral hip arthritis, bilateral facet arthropathy from L4 through S1 of the lumbar spine, and mild patellofemoral arthritis of the right knee. Dr. M.H.L. reiterated that the Veteran's left knee disability affected his gait in 1955 and opined that it was likely that his left knee had affected his gait ever since. Based on examination of the Veteran, a review of the Veteran's medical records, and the Veteran's statements, Dr. M.H.L. opined that the current osteoarthritis of the hips, lumbar spine, and right knee are most likely secondary to the Veteran's service-connected left knee disability. Specifically, Dr. M.H.L. wrote that the Veteran's abnormal gait most likely caused damage to the right knee, hips, and lumbar spine due to an abnormal stress related to the Veteran's service-connected left knee disability. 

Similarly, in a July 2017 statement from Dr. C.W.M. it was noted that there was X-ray evidence of damage to the first metatarsal phalangeal joint of the left foot. Dr. C.W.M. also found that, as there are many forces in play with pedal biomechanics, it was fair to say that the Veteran's antalgic gait since 1955 likely contributed to the development of the damage present to his first metatarsal phalangeal joint of the left foot. However, there were likely other contributing factors as well over the past six decades.

The Veteran was afforded VA examinations pertaining to his claimed disabilities in June 2017 and November 2017 and was diagnosed with scars of the chin and right thumb, residuals of a left 5th finger fracture, and arthritis of the spine, hips, right knee, and left foot. 

Significantly, the Veteran was also diagnosed with left leg atrophy during a June 2017 VA muscle examination. In a June 2017 medical opinion, the examiner found that the Veteran's left leg atrophy was at least as likely as not (50 percent or greater probability) proximately due to or the result of his service-connected left knee disability. In making this opinion, the examiner noted the Veteran's in-service injury of the left knee and post-service records showing a diagnosis of arthritis as early as October 2007. 

In a November 2017 medical opinion, the VA examiner found that the Veteran's gait was normal following his March 1955 left knee surgery and continued to be normal until at least 2011 when he was found to have a normal gait by a neurosurgeon. The examiner also found that the Veteran was first diagnosed with arthritis of the right hip and knee in 2003. As such, the VA examiner opined that it was not probable that the Veteran's arthritis of the claimed joints arose as a result of gait disturbance due to his service-connected left knee disability. The examiner also opined that the Veteran's fall resulting in lacerations to the chin and right thumb as well as left 5th finger fracture was not due to the Veteran's service-connected left knee disability and was, instead, due to the nonservice-connected neurologic pathology involving his left leg. 

In December 2017 correspondence, the Veteran's attorney argued that the November 2017 VA opinion regarding the onset of gait disturbance contradicted itself when it argued both that there was "no" gait disturbance before 2011 but also found that a gait disturbance was "not significantly pronounced" prior to 2011. The Veteran's attorney also argued that the November 2017 VA opinion did not address the aggravation aspect of the claim. Finally, with regard to the cause of the October 2016 fall resulting in lacerations to the chin and right thumb as well as left 5th finger fracture, the Veteran's attorney argued that the neurologic pathology involving the Veteran's left leg cannot be disassociated from the Veteran's service-connected left knee disability. 

Upon review of the evidence, the Board finds that the evidence of record is in relative equipoise and, affording the Veteran the benefit of the doubt, service connection for a left foot/toe disability, a left hip disability, a right hip disability, chin laceration, a lumbar spine disability, left 5th finger laceration, a right knee disability, and right thumb laceration is warranted. 

As an initial matter, the Board finds that the Veteran has current diagnoses of a left foot/toe disability, a left hip disability, a right hip disability, chin laceration, a lumbar spine disability, left 5th finger laceration, a right knee disability, and right thumb laceration. Furthermore, there is medical evidence that such disabilities are related to the Veteran's service-connected left knee disability. 

With regard to the left foot/toe, left hip, right hip, lumbar spine, and right knee issues, while the November 2017 VA examiner opined that such disorders were not related to the Veteran's service-connected left knee disability given that there was no evidence of gait disturbance until after 2011, the Board notes that the basis for this opinion is based on factual inaccuracy. As above, the Veteran's June 1955 service treatment record shows a significant gait disturbance. Furthermore, in the October 2016 statement Dr. M.H.L. opined that the Veteran's left knee disability affected his gait in 1955 and opined that it was likely that his left knee had affected his gait ever since. 

With regard to the chin laceration, left 5th finger laceration, and right thumb laceration issues, the Board finds that the Veteran's statements that his fall in October 2016 was the result of his left knee giving way are credible. The Board further finds that November 2017 VA opinion relating the Veteran's falls to nonservice-connected neurologic pathology involving his left leg contradicts the findings in the November 2017 VA examination that the Veteran experiences instability of the left knee. 

Accordingly, the Board resolves all doubt in favor of the Veteran and finds that a left foot/toe disability, a left hip disability, a right hip disability, chin laceration, a lumbar spine disability, left 5th finger laceration, a right knee disability, and right thumb laceration are related to his service-connected left knee disability. Therefore, service connection for such disorders is warranted. 38 U.S.C. §§ 1110, 1131, 5107; 38 C.F.R. §§ 3.102, 3.303; Gilbert, supra.

III. Increased Rating Analysis

Disability evaluations are determined by evaluating the extent to which a Veteran's service-connected disability adversely affects his ability to function under the ordinary conditions of daily life, including employment, by comparing his symptomatology with the criteria set forth in the Schedule for Rating Disabilities (Rating Schedule). 38 U.S.C. § 1155 (2014); 38 C.F.R. §§ 4.1, 4.2, 4.10 (2017).

In evaluating a disability, the Board considers the current examination reports in light of the whole recorded history to ensure that the current rating accurately reflects the severity of the condition. The Board has a duty to acknowledge and consider all regulations that are potentially applicable. Schafrath v. Derwinski, 
1 Vet. App. 589 (1991). The medical as well as industrial history is to be considered, and a full description of the effects of the disability upon ordinary activity is also required. 38 C.F.R. §§ 4.1, 4.2, 4.10.

Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. See 38 C.F.R. § 4.7 (2017).

In view of the number of atypical instances it is not expected, especially with the more fully described grades of disabilities, that all cases will show all the findings specified. Findings sufficiently characteristic to identify the disease and the disability therefrom, and above all, coordination of rating with impairment of function will, however, be expected in all instances. 38 C.F.R. § 4.21 (2017).

Where entitlement to compensation has already been established and an increase in the disability rating is at issue, the present level of disability is of primary concern. Although a rating specialist is directed to review the recorded history of a disability in order to make a more accurate evaluation, see 38 C.F.R. § 4.2, the regulations do not give past medical reports precedence over current findings. Francisco v. Brown, 7 Vet. App. 55 (1994). Staged ratings are, however, appropriate for an increased rating claim when the factual findings show distinct time periods where the service-connected disability exhibits symptoms that would warrant different ratings. The relevant focus for adjudicating an increased rating claim is on the evidence concerning the state of the disability from the time period one year before the claim was filed until VA makes a final decision on the claim. Hart v. Mansfield, 21 Vet. App. 505 (2007).

When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Secretary shall give the benefit of the doubt to the claimant. 38 U.S.C. § 5107; see also Gilbert v. Derwinski, 1 Vet. App. 49, 53 (1990).

1. Left knee

The Veteran contends that his left knee disability is worse than currently rated. Knee disabilities are rated primarily based upon limitation of motion of the affected joint. Limitation of flexion and extension of the knees is rated under 38 C.F.R. 
§ 4.71(a), DCs 5260 (flexion) and 5261 (extension) (2017). 

A 10 percent rating is warranted where flexion is limited to 45 degrees and a 20 percent rating is warranted where flexion is limited to 30 degrees. Where flexion is limited to 15 degrees, a 30 percent rating is provided. 38 C.F.R. § 4.71(a), DC 5260.

A 20 percent rating is warranted where extension of the leg is limited to 15 degrees. A 30 percent rating is for assignment for extension limited to 20 degrees. 38 C.F.R. § 4.71(a), DC 5261.

Full range of motion in the knee is from 0 degrees extension to 140 degrees flexion. See 38 C.F.R. § 4.71, Plate II (2017).

Under DC 5257, when there is recurrent subluxation or lateral instability which is moderate, a 20 percent evaluation is assignable; a 30 percent evaluation is assignable when it is severe. 38 C.F.R. § 4.71(a), DC 5257 (2017).

Under DC 5256, a minimum 30 percent rating is assigned for ankylosis of a knee at a favorable angle in full extension, or in slight flexion between 0 degrees and 10 degrees. A 40 percent rating may be assigned for ankylosis of a knee in flexion between 10 degrees and 20 degrees. A 50 percent rating may be assigned for ankylosis of a knee between 20 degrees and 45 degrees. A 60 percent rating may be assigned for extremely unfavorable ankylosis of a knee in flexion at an angle of 45 degrees or more. 38 C.F.R. § 4.71a, DC 5256 (2017). 

VA's General Counsel has held that a claimant who has arthritis and instability of the knee may be rated separately under DCs 5003 and 5257. VAOPGCPREC 23-97; 62 Fed. Reg. 63,604 (1997). The General Counsel subsequently clarified that for a knee disability rated under DC 5257 to warrant a separate rating for arthritis based on X-ray findings and limitation of motion, limitation of motion under DC 5260 or DC 5261 need not be compensable but must at least meet the criteria for a zero-percent rating. A separate rating for arthritis could also be based on X-ray findings and painful motion under 38 C.F.R. § 4.59. VAOPGCPREC 9-98 (1998).

The General Counsel has also held that separate ratings can be provided for limitation of knee extension and flexion that is compensable under DC 5260 or 5261. VAOPGCPREC 9-2004; 69 Fed. Reg. 59,990 (2004).

For disabilities evaluated on the basis of limitation of motion, VA is required to apply the provisions of 38 C.F.R. §§ 4.40, 4.45 (2017), pertaining to functional impairment. The Court has instructed that in applying these regulations VA should obtain examinations in which the examiner determined whether the disability was manifested by weakened movement, excess fatigability, incoordination, flare-ups, or pain. Such inquiry is not to be limited to muscles or nerves. These determinations are, if feasible, to be expressed in terms of the degree of additional range-of-motion loss due to any weakened movement, excess fatigability, incoordination, flare-ups, or pain. DeLuca v. Brown, 8 Vet. App. 202 (1995); see also Johnston v. Brown, 10 Vet. App. 80, 84-5 (1997); 38 C.F.R. § 4.59.

The Court has recently held that "pain itself does not rise to the level of functional loss as contemplated by VA regulations applicable to the musculoskeletal system." Mitchell v. Shinseki, 25 Vet. App. 32 (2011). Rather, to support an increased rating, pain must result in functional loss in terms of limitations in the ability "to perform the normal working movements of the body with normal excursion, strength, speed, coordination [, or] endurance." Id., quoting 38 C.F.R. § 4.40.

Recently, in Correia v. McDonald, 28 Vet. App. 158 (2016), the Court held that the final sentence of 38 C.F.R. § 4.59 creates a requirement that certain range of motion testing be conducted whenever possible in cases of joint disabilities. The final sentence provides that "[t]he joints involved should be tested for pain on both active and passive motion, in weight-bearing and nonweight-bearing and, if possible, with the range of the opposite undamaged joint." The Court found that, to be adequate, a VA examination of the joints must, wherever possible, include the results of the range of motion testing described in the final sentence of § 4.59.

The left knee disability is currently rated as 10 percent disabling prior to April 10, 2017 based on painful motion of the knee without compensable limitation of motion and 30 percent disabling beginning April 10, 2017 based on extension limited to 20 degrees. 

Historically, by rating decision dated in November 1955, the RO granted service connection for P.O. Residuals, arthrotomy, left knee and assigned a 10 percent disability rating effective August 13, 1955, under DC 5257. The 10 percent rating under DC 5257 remained in effect for P.O. Residuals, arthrotomy, left knee from August 1955 to July 2013, a period well in excess of the 20 years required for protection of that rating. See 38 C.F.R. §§ 3.951, 3.952. Mistakenly, the RO issued a decision in December 2013 stating that it was increasing a "noncompensable" left knee rating to 10 percent based on painful motion of the knee and 38 C.F.R. § 4.59, under DC 5260. However, that decision failed to acknowledge the 10 percent rating under DC effective since August 1955. Thereafter, in the April 2014 statement of the case, the RO noted the mistake and continued the original 10 percent rating but, in doing so, kept the rating under DC 5260, without addressing DC 5257, the assigned DC in the November 1955 rating decision. 

In reviewing 38 C.F.R. § 4.71a, DC 5257 in 1955, the Board notes that such code pertained to recurrent subluxation or lateral instability of the knee at that time (as it does currently). However, the basis for the 10 percent rating in the December 2013 rating decision was the finding of painful motion of the knee without compensable limitation of motion. As such, the Board finds that, beginning July 1, 2013 (the date of claim for an increased rating) the Veteran is entitled to two separate 10 percent ratings; the 10 percent rating under DC 5257 (pertaining to recurrent subluxation or lateral instability of the knee) and the ratings under DCs 5260 and 5261 (pertaining to limitation of flexion and extension) through the application of 38 C.F.R. § 4.59 as assigned by the RO in the December 2013 rating decision under DC 5260. 

As for the potential for even higher ratings for the period of time prior to April 10, 2017, in order to warrant a higher rating for the left knee disability, the record must demonstrate the functional equivalent of limitation of flexion to at least 30 degrees or extension to at least 10 degrees, moderate to severe subluxation or instability, or ankylosis. 38 C.F.R. §§ 4.59, 4.71(a), DCs 5256, 5257, 5260, 5261; DeLuca v. Brown, 8 Vet. App. 202 (1995). 

Left knee range of motion and stability were tested multiple times prior to April 10, 2017. The Veteran received a VA examination in October 2013, where the Veteran reported that his mildly painful condition of the left knee has not really ever completely resolved since it's incurrence during service, but it has improved with antiinflammatory medicine. He reported that since his injury, he has used strengthening exercises and walks for at least an hour a day. Upon examination, the examiner found full flexion, with objective evidence of pain beginning at 120 degrees, and full extension without any objective evidence of painful motion. There was no change with repetitive-use testing. The examiner found full muscle strength, normal left knee stability, and no evidence of subluxation or dislocation upon examination or X-ray. 

Regarding flare-ups, the Veteran reported that he is quite physically active, particularly in walking, but states that occasionally he "overdoes it" with too much inclined walking, stairs, or carrying too much weight, and the pain will increase. However, he did not describe any reduction in range of motion when this occurs and he reported that the increased pain usually subsides within a day or two. 

The examiner explained that he has near constant mild knee pain, especially on the left, which does not prevent him from walking for exercise at least an hour each day and doing quad strengthening exercises each day. He reported that he goes on 30 day backpacking and camping expeditions three times per year, but stated that he is no longer able to handle steep inclines. The examiner stated that there really is not much functional impairment, but that there is some evidence of pain on flexion and mild pain on firm palpation of the left knee joint line. The examiner further stated that while any human joint could experience limitation of function due to flare ups or repetitive use over time due to pain, weakness, fatigability, or incoordination, even in joints with no history of illness or injury, it is not possible to opine without speculation as to such impairment in the Veteran's left knee without examining the knee during a flare-up or aggravation. However, the examiner again noted that the Veteran did not report any additional limitation of motion during flare-ups. 

VA treatment records document regular complaints of pain in the left knee, but do not include any information regarding range of motion, stability, or ankylosis. The Board notes that the in November 2014, the Veteran reported left knee pain but stated that he did not feel as though he needed physical therapy or orthopedic referral. An X-ray that month revealed mild patellofemoral osteoarthritis and the treatment note indicated that the left knee was "quite stable." 

In an October 2015 VA examination report, the Veteran reported that he was an avid hiker and has done strengthening exercises to keep himself in optimal condition, in spite of ongoing chronic knee pain. He stated that he spends several months every year on the road in an RV or tent camping and hiking. When home, he goes walking every day, lasting until recently several hours each day, and now, after his service dog had an ACL repair, only one hour a day. The Veteran reported that he continued to use his universal gym at home for daily strengthening exercises with active resistance. He reported daily left knee pain, which is severe in the morning for about a half an hour and which gradually subsides with activity. He takes occasional anti-inflammatories, but usually does not take anything for left knee pain. Significantly, in a September 2015 letter from the Veteran, which was prepared for the examination and is included in its entirety in the report, the Veteran described a constant mild level of pain, which typically increased to a high between 4 and 6 on a 10 point scale, where 10 is the most severe, after his daily long hikes or walk or after sleeping. He described this pain as moderate. He also reported a loss of strength when he first wakes in the morning, which goes away once he's active. He reported difficulty getting out of the car without pulling himself out, increasing pain when he crosses his leg, and a gradual loss of the ability to perform a "hip slide" down a near vertical rock face while hiking. Finally, the Veteran reported pain while sleeping on his back, which is alleviated by placing a pillow under his knee. 

Upon examination, the examiner found full range of motion without any objective evidence of pain and no change with repetitive testing. There was no evidence of pain with weight bearing, no objective evidence of localized tenderness of pain on palpation of the joint or associated soft tissue, and no evidence of crepitus. The examiner found full strength of the left knee, no muscle atrophy, no ankylosis, no subluxation or instability, and no recurrent effusion. The examiner also stated that there was no neurologic impairment demonstrated upon examination that day. 

Regarding flare-ups, the examiner stated that he could only quantify the effects of observed repetitive use and could not comment as to functional impairment beyond after three repetitions at that examination. However, the examiner stated the opinion that while the Veteran would likely have increased pain after repeated use over time as well as during a flare-up, he does not believe the Veteran would have any further reduction in motion or incoordination, other than a reluctance to move the knee because of increased pain. The examiner also stated that the Veteran would have only the degree of fatigue and weakness to be expected in an otherwise fit 79-year-old man. 

The examiner concluded based upon the examination and the Veteran's September 2015 statement, which he said he had no reason to believe is inaccurate, the Veteran is a very fit 79 year old. In spite of the reported pain, the Veteran would be capable of light duty type work, to include standing and walking during a work day without limitations other than a requirement for occasional sitting breaks. The examiner stated that there was no reason why the Veteran could not occasionally climb stairs, kneel, squat, bend, crouch, and lift/carry up to 20 pounds occasionally and 10 pounds routinely. The examiner further stated that he would not expect routine ADLs to be impaired at all. 

Based on the forgoing, the Board finds that, prior to April 10, 2017, the evidence did not support the assignment of a disability rating in excess of 10 percent for loss of motion or a disability rating in excess of 10 percent for instability. With regard to loss of motion, the record demonstrates that the Veteran did not have compensable limitation of flexion or extension in the left knee prior to April 10, 2017. In fact, his range of motion was full during this time and only once, during the October 2015 examination, was pain found upon motion at 120 degrees. There was no indication that range of motion was additionally limited at that time by functional factors, nor does the record demonstrate such additional limitation at any time throughout this appeal. In fact, the Veteran reported that he did not experience loss of range of motion during a flare-up or due to pain in the October 2013 VA examination and the October 2015 VA examiner did not think there would be a loss of range of motion during flare-ups or to functional factors such as pain, incoordination, fatigue, or weakness. The recorded limitation of flexion and extension did not approximate the criteria for a 20 percent or higher rating, which requires limitation of flexion to at least 30 degrees or limitation of extension to 10 degrees. 38 C.F.R. § 4.71a, DCs 5260 and 5261.

Furthermore, while the Veteran is in receipt of a 10 percent rating under DC 5257 for recurrent subluxation or lateral instability, no VA examiner or treatment provider has found medical evidence of instability or subluxation. In fact, both the October 2013 and October 2015 VA examiners specifically found the absence of instability or subluxation. Therefore, an increased rating on the basis of instability is not warranted under 38 C.F.R. § 4.71a, DCs 5256 and 5257. 

For the period of time beginning April 10, 2017, in order to warrant a higher rating for the left knee disability, the record must demonstrate the functional equivalent of ankylosis of a knee in flexion between 10 degrees and 20 degrees. 38 C.F.R. 
§§ 4.59, 4.71(a), DCs 5256, 5257, 5260, 5261; DeLuca v. Brown, 
8 Vet. App. 202 (1995).

Since April 10, 2017 the Veteran has been afforded two VA knee examinations, first in April 2017 and again in November 2017. During the April 2017 VA examination, the examiner noted diagnoses of osteoarthritis and osteochondritis of the left knee. The Veteran reported that the pain in his left knee had significantly worsened from that noted in 2013 or 2015. He also experienced weakness and muscle wasting of the left lower extremity. His gait was found to be antalgic and he was unable to fully extend the left knee. The Veteran walked with obvious pain and, during the examination, had an obvious very painful muscle spasm of the left leg. He reported that he had previously had steroid injections in the left knee until recently which had helped with the pain but he was unable to continue this treatment as he was on anticoagulants. He took Ibuprofen with opioids for the pain as this was the only thing he could take. He was scheduled to try acupuncture. 

The Veteran reported experiencing flare-ups of the left knee. While the Veteran was not exactly sure what constituted a flare-up, he stated that he had increased pain nearly every day. Specifically, he had spasms of pain associated with muscle spasms that are brief, lasting a few minutes but extremely painful and intense, usually in the left leg which interrupted whatever he was doing, therefore precluding driving. He also stated that whenever he walked or stood too long, perhaps every other day or so, he experienced an increase in pain, requiring him to rest and take pain medication. The Veteran also reported experiencing swelling of the left knee, requiring elevation and rest. This resolved within a couple of hours typically.

The Veteran also reported experiencing functional loss or functional impairment of the left knee. Specifically, the Veteran reported that he used to be an avid outdoorsman, and hiker, but now could not hike at all. He had problems with his knee giving out on him, and could not walk more than about a block. He used a service dog, and would use a cane if he did not have the dog. He always used a knee brace for stability, but still fell often. He tired very easily and could not bend
over very far.

On range of motion testing, the Veteran had flexion to 110 degrees and extension to only 20 degrees. There was evidence of pain on motion and pain with weight bearing. There was also objective evidence of localized tenderness or pain on palpation of the joint or associated soft tissue, specifically moderate medial joint line tenderness and tenderness over and under the patella. There was also objective evidence of crepitus. Significantly, the Veteran was unable to perform repetitive use testing with at least three repetitions due to fear of muscle spasms (he had one while he was doing initial testing). 

The examiner noted that the left knee was not examined immediately after repetitive use over time and that the examination was neither medically consistent or inconsistent with the Veteran's statements describing functional loss with repetitive use over time. The examiner was unable to state without mere speculation whether pain, weakness, fatigability, or incoordination significantly limited functional ability with repeated use over a period of time. 

Similarly, the examiner noted that the left knee was not examined during a flare-up and that the examination was neither medically consistent or inconsistent with the Veteran's statements describing functional loss during flare-ups. The examiner was unable to state without mere speculation whether pain, weakness, fatigability, or incoordination significantly limited functional ability with flare-ups. 

However, the examiner noted that it was possible for any human joint to have limited function during a flare-up or in repetitive use of the joint over time due to pain, weakness, fatigability, or incoordination. This could and did occur in joints with no history of illness or injury when subject to sufficient force, frequency, and duration of movement and extreme range of motion.

With regard to the severity of the Veteran's left knee after repetitive use over time or during a flare-up, the examiner indicated that the requested opinion could be accurately provided if two examinations were conducted and properly documented: one in the presence of a flare-up or severe aggravation due to recent overuse where the flare-up or aggravation is present at the time of examination, and the other examination in the absence of a flare-up or aggravation. However, scheduling several appointments would not ensure capture of the desired two sets of data required, would prohibit provision of a response in the specified request window, and would substantially delay examination of other veterans. Absent that data, the requested opinion could only be made assuming Veterans' subjectively reported limitations to range of motion are as accurate as if obtained via the objective measurement of a qualified health care provider. As such, the examiner opined that such an assumption could not be reasonably and consistently defended and the requested opinion was not feasible.

With regard to additional factors contributing to the Veteran's left knee disability, the examiner noted that the Veteran had muscle atrophy due to disuse from pain as well as antalgic gait due to pain, which resulted in the inability to stand/walk more than about two hours total each day. 

On muscle strength testing, the Veteran had active movement against some resistant on the left knee with reduction in muscle strength and the examiner noted that the reduction in strength was entirely due to the Veteran's service-connected left knee disability. The examiner also noted that there was muscle atrophy which was also due to the Veteran's service-connected left knee disability. There was no ankylosis. 

On joint stability testing, there was no history of recurrent subluxation, lateral instability, or recurrent effusion. There was also no medical evidence of joint instability on upon joint stability testing. There was no evidence of recurrent patellar dislocation, "shin splints," (medial tibial stress syndrome), stress fractures, chronic exertional compartment syndrome, or any other tibial and/or fibular impairment. There was also no evidence of a meniscal condition. It was noted that the Veteran underwent left knee arthrotomy in March 1955 but that there had been no other surgeries. 

With regard to other pertinent physical findings, complications, conditions, signs, symptoms, or scars, the examiner noted that there was gait impairment (antalgic), muscle wasting, muscle spasms, and pain. There was also a scar of the left knee medial side which was not painful or unstable and did not have a total area equal to or greater than 39 square centimeters which was located on the head, face, or neck. 

With regard to assistive devices, it was noted that the Veteran constantly wore a brace on his left knee. The examiner noted that there was no functional impairment of an extremity such that no effective function remained other than that which would be equally well served by an amputation with prosthesis. Diagnostic imaging noted degenerative or traumatic arthritis. 

With regard to the Veteran's employability, the examiner noted that the Veteran's left knee disability impacted his ability to perform occupational tasks. Specifically, it was noted that the Veteran has muscle atrophy due to disuse from pain, and antalgic gait from pain, hence inability to stand/walk more than about two hours total in a day. He is unstable and has to use a knee brace, and a service dog, but still falls frequently. He is able to sit for about four hours per day at a maximum. He had frequent painful muscle spasms and was on chronic opioid pain medications so may have impaired mentation, and would be unable to drive or operate machinery with his feet due to the muscle spasms. He would be unable to stand fully erect due to the inability to fully extend the left knee and bending over at the knees is very painful, as witnessed by the examiner, and would be only rarely possible. Climbing stairs would be rare also. The Veteran could not perform overhead work or use ladders and could not work in areas with uneven surfaces or hazards. 

Finally, with regard to Correia, the examiner wrote that the Veteran had pain both on active and passive range of motion, both weightbearing and nonweightbearing, about equally. There was pain on passive range of motion testing and evidence of pain when the joint was used in non-weight bearing. Significantly, the April 2017 VA examination report includes range of motion testing for the right knee as well which is also damaged. 

During the November 2017 VA examination, the examiner noted diagnoses of arthritis and enthesopathy of the left knee. The Veteran reported that he wore a brace on the left knee. Over the past four to five years, the Veteran's left knee became progressively painful to the point where he could no longer hike. He stated that his left knee often gave out on him and he reportedly fell every three to four weeks. The Veteran reported experiencing flare-ups of the left knee. Specifically, he had trouble when he over used the left knee and then experienced pain. 

On range of motion testing, the Veteran had flexion to 110 degrees and extension to 5 degrees. This, according to the Veteran, resulted in functional loss in that he was not able to squat easily, though, according to the examiner, the neurologic condition was the most limiting. There was evidence of pain with weight bearing but no objective evidence of localized tenderness or pain on palpation of the joint or associated soft tissue and no objective evidence of crepitus. 

On repetitive use testing, the Veteran was able to perform repetitive use testing with at least three repetitions and there was no additional functional loss after three repetitions. The examiner noted that the left knee was not examined immediately after repetitive use over time and that the examination was neither medically consistent or inconsistent with the Veteran's statements describing functional loss with repetitive use over time. The examiner was unable to state without mere speculation whether pain, weakness, fatigability, or incoordination significantly limited functional ability with repeated use over a period of time. 

Similarly, the examiner noted that the left knee was not examined during a flare-up and that the examination was neither medically consistent or inconsistent with the Veteran's statements describing functional loss during flare-ups. The examiner was unable to state without mere speculation whether pain, weakness, fatigability, or incoordination significantly limited functional ability with flare-ups. 

With regard to additional factors contributing to the Veteran's left knee disability, the examiner noted that the Veteran had an antalgic gait, loss of range of motion, excessive laxity due to ACL and collaterals. 

On muscle strength testing, the Veteran had active movement against some resistant on the left knee with reduction in muscle strength and the examiner noted that the reduction in strength was not entirely due to the Veteran's service-connected left knee disability as the Veteran's history and findings were consistent with a lumbar radiculopathy involving innervation to the psoas, quadriceps and hamstrings, and ankle/great toe dorsiflexors. The examiner also noted that there was muscle atrophy which was not due to the Veteran's service-connected left knee disability as the Veteran had a long standing history of lumbar radicular symptoms. A recent EMG was abnormal and he was awaiting an imaging study to assess a pelvic mass that was thought to possibly be adversely impacting his lumbosacral plexus (he had a May 2011 abdominal/pelvic CT consistent with right sided renal carcinoma). From 10 centimeters below the tibial plateau, he had a 39 centimeter circumference to the right and 34 centimeter circumference to the left. There was no ankylosis. 

On joint stability testing, there was no history of recurrent subluxation, lateral instability, or recurrent effusion. There was also no medical evidence of joint instability on upon joint stability testing. There was no evidence of recurrent patellar dislocation, "shin splints," (medial tibial stress syndrome), stress fractures, chronic exertional compartment syndrome, or any other tibial and/or fibular impairment. There was also no evidence of a meniscal condition. 

With regard to other pertinent physical findings, complications, conditions, signs, symptoms, or scars, the examiner noted that there were findings associated with the Veteran's lumbar spine disability. There was also a scar of the left knee medial side which was not painful or unstable and did not have a total area equal to or greater than 39 square centimeters which was located on the head, face, or neck. 

With regard to assistive devices, it was noted that the Veteran regularly used a brace, cane, and orthotics. Specifically, the examiner noted that the Veteran wore orthotics due to bunions of the feet. He used a cane due to balance issues (due to neuropathy but also possibly the knee as well), wore a knee brace due to pain and instability (though all structures appeared to be intact other than some laxity to the ACL and medial collateral, though loss of muscle tone and strength are probably contributing factors). The examiner noted that there was no functional impairment of an extremity such that no effective function remained other than that which would be equally well served by an amputation with prosthesis. Diagnostic imaging noted degenerative or traumatic arthritis. Diagnostic imaging also showed mild patellofemoral joint productive changes and superior patellar enthesophyte.

With regard to the Veteran's employability, the examiner noted that the Veteran's left knee disability impacted his ability to perform occupational tasks. Specifically, it was noted that the Veteran must avoid heavy lifting (more than 25 pounds), avoid stairs and uneven surfaces, and could not use ladders. He was also limited to standing and walking due to his lumbar spine condition. 

Finally, with regard to Correia, the examiner wrote that the Veteran had no pain with nonweightbearing but did have pain with passive range of motion which resulted in a loss of flexion beyond 90 degrees secondary to severe pain. There was also pain with weightbearing which caused an antalgic gait. Significantly, the November 2017 VA examination report includes range of motion testing for the right knee as well which is also damaged. 

With regard to the period of time beginning April 10, 2017, the Board finds that no more than the currently assigned 30 percent rating (for loss of extension) and 10 percent rating (for instability) is warranted for the Veteran's left knee disability. As to whether a higher rating is available under either DCs 5260 or 5261 due to the Veteran's loss of motion in the left knee, the Veteran had flexion to 120 degrees and extension to 20 degrees in April 2017 and had flexion to 110 degrees and extension to 5 degrees in November 2017. Such findings do not warrant a rating in excess of 30 percent for loss of extension as such requires limitation of extension to 30 degrees for a 40 percent rating for loss of extension pursuant to DC 5261. Furthermore, such findings do not support a separate rating for loss of flexion as such requires limitation of flexion to 45 degrees for a separate 10 percent for loss of flexion pursuant to DC 5260. 38 C.F.R. § 4.71a, DCs 5260 and 5261. As to whether pain, weakness, fatigability, or incoordination significantly limited functional ability during flare-ups or with repeated use over a period of time, both the April and November 2017 VA examiners were unable to state whether this was the case without speculation. 

As to whether a higher rating is available under DC 5257, while the Veteran is in receipt of a 10 percent rating under DC 5257 for recurrent subluxation or lateral instability, no VA examiner or treatment provider has found instability or subluxation. In fact, both the April 2017 and November 2017 VA examiners specifically found the absence of any clinical evidence of instability or subluxation. Therefore, an increased rating on the basis of instability is not warranted under 38 C.F.R. § 4.71a, DC 5257.

With regard to both periods of time (prior to and beginning April 10, 2017), the Board acknowledges the Veteran's numerous statements reporting pain, weakness, and fatigue as well as flare-ups. However, he did not report any additional limitation of motion during any flare-ups, and he described such flare-ups as predominately moderate at worst. He certainly had not reported flare-ups so severe that they resulted in a limitation of motion of higher than the loss of motion reported above. 
 
Even giving full consideration to the Veteran's complaints of pain on motion, higher disability ratings are not warranted for the knee disability under 38 C.F.R. §§ 4.40, 4.45, 4.59, and with consideration of the DeLuca and Mitchell factors. No higher compensation is warranted under these provisions because there is no persuasive evidence of additional functional loss due to pain, weakness, fatigue, or incoordination which would limit motion to such a degree so as to warrant a rating in excess of the currently assigned ratings. VA examinations have reflected that pain was elicited only at the end ranges on flexion/extension. Accordingly, the Veteran is already receiving the appropriate amount of compensation for the extent of her limited motion, pain, functional impairment based on the other DeLuca and Mitchell factors.

With regard to neurological impairment related to the left knee, the Board finds that a separate 10 percent rating, but no higher, under DC 5314 is warranted for the Veteran's muscle atrophy of his left leg. 38 C.F.R. §§ 4.56, 4.73; DC 5314. In this regard, the April 2017 VA examiner noted muscle atrophy of the left leg due to disuse from pain and opined that the Veteran's muscle atrophy was due to his service-connected left knee disability. A June 2017 VA muscle examination also noted mild muscle atrophy of the left leg due to disuse and pain. As the objective findings reflect muscle impairment of the left leg manifested by atrophy and weakness, without more severe symptomatology indicative of a moderately severe or severe muscle injury, the Board finds that such condition most nearly approximates no more than a moderate disability as contemplated by DC 5314. 38 C.F.R. §§ 4.56, 4.73; DC 5314.

Turning to the remaining, potentially applicable diagnostic codes for evaluating knee disability under 38 C.F.R. § 4.71a, the Board finds that no higher rating is assignable. DC 5256 would not apply in this case because the pertinent medical evidence of record has not documented any ankylosis of the left knee. With regard to DC 5258 (rating criteria for dislocation of semilunar cartilage with frequent episodes of locking, pain and effusion into the joint), the clinical evidence fails to reveal objective evidence of such manifestations. 

The Board has carefully reviewed and considered the Veteran's statements regarding the severity of his left knee disability. The Board acknowledges that the Veteran, in advancing this appeal, believes that the disability on appeal has been more severe than the assigned disability rating reflects. Medical evidence is generally required to address questions requiring medical expertise. Cromley v. Brown, 7 Vet. App. 376, 379 (1995). However, lay assertions may serve to support a claim by supporting the occurrence of lay-observable events or the presence of symptoms of disability subject to lay observation. 38 U.S.C. § 1154(a) (2014); 38 C.F.R. § 3.303(a) (2013); Jandreau v. Nicholson, 492 F.3d 1372 (Fed. Cir. 2007); see Buchanan v. Nicholson, 451 F.3d 1331, 1336 (Fed. Cir. 2006) (addressing lay evidence as potentially competent to support presence of disability even where not corroborated by contemporaneous medical evidence). In this regard, the Veteran is generally competent to report his subjective symptoms relating to the knee. 

Lay reports of symptoms and history associated with the right knee disability have been considered together with the probative medical evidence clinically evaluating the severity of the pertinent disability symptoms. However, the clinical evidence offering detailed, specific, objective determinations pertinent to the rating criteria and manifestations associated with the right knee condition is found to be the most probative and credible evidence with regard to evaluating the pertinent symptoms for the knee disability on appeal.

In sum, the evidence supports the continuation of the assigned ratings. Although the Veteran is entitled to the benefit of the doubt where the evidence is in approximate balance, the benefit of the doubt doctrine is inapplicable where, as here, the preponderance of the evidence is against the claim. See generally Gilbert v. Derwinski, 1 Vet. App. 49 (1990); Ortiz v. Principi, 274 F. 3d 1361 (Fed. Cir. 2001). 

In May 2017 correspondence, the Veteran's attorney requested an extraschedular rating for the Veteran's service-connected left knee disability but did not explain why such a rating was warranted in the Veteran's case. In exceptional cases an extraschedular rating may be provided. 38 C.F.R. § 3.321. The Court of Appeals for Veteran Claims has set out a three-part test, based on the language of 38 C.F.R. § 3.321 (b)(1), for determining whether a Veteran is entitled to an extra-schedular rating-(1) the established schedular criteria must be inadequate to describe the severity and symptoms of the claimant's disability; (2) the case must present other indicia of an exceptional or unusual disability picture, such as marked interference with employment or frequent periods of hospitalization; and (3) the award of an extra-schedular disability rating must be in the interest of justice. Thun v. Peake, 22 Vet. App. 111 (2008), aff'd, Thun v. Shinseki, 572 F.3d 1366 (Fed. Cir. 2009). Therefore, initially, there must be a comparison between the level of severity and symptomatology of the claimant's service-connected disability with the established criteria found in the rating schedule for that disability. 

Here, the nature and severity of the Veteran's left knee disability, including the pain, weakness, and painful motion, are contemplated by the rating criteria. In other words, he does not experience problems due to this service-connected disability that are not accounted for by the rating schedule. Therefore, referral for extra-schedular consideration is not warranted.

Accordingly, the Board concludes that the preponderance of the evidence is against the claim, and it is, therefore, denied. In arriving at the decision to deny the claim, the Board has considered the applicability of the benefit-of-the-doubt rule enunciated in 38 U.S.C. § 5107(b). Because, however, there is not an approximate balance of evidence, that rule is not helpful to the Veteran. See Gilbert v. Derwinski, 1 Vet. App. 49 (1990); Ortiz v. Principi, 274 F. 3d 1361 (Fed. Cir. 2001).

2. Scar

The Veteran's left knee scar is rated as noncompensably disabling under 38 C.F.R. § 4.118, DC 7805. 

The diagnostic criteria for disorders of the skin are found at 38 C.F.R. § 4.118, DCs 7801-7805. Under DC 7801, burn scar(s) or scar(s) due to other causes, not of the head, face, or neck, that are deep and nonlinear in an area or areas of at least 6 square inches (39 sq. cm.) but less than 12 square inches (77 sq. cm.) warrant a 10 percent rating
 
Under DC 7802, burn scar(s) or scar(s) due to other causes, not of the head, face, or neck, that are superficial and nonlinear in an area or areas of 144 square inches (929 sq. cm.) or greater warrant a 10 percent evaluation. Note (2) under that code provides that if multiple qualifying scars are present, assign a separate evaluation for each affected extremity based on the total area of the qualifying scars that affect that extremity.

Under DC 7804, one or two scars that are unstable or painful warrant a 10 percent evaluation. Note (2) for that code provides that if one or more scars are both unstable and painful, add 10 percent to the evaluation that is based on the total number of unstable or painful scars. Note (3) under that provides that scars evaluated under DCs 7800, 7801, 7802, or 7805 may also receive an evaluation under DC 7803, when applicable.

DC 7805 provides that other scars (including linear scars) and other effects of scars evaluated under DCs 7800, 7801, 7802, and 7804 require the evaluation of any disabling effect(s) not considered in a rating provided under DCs 7800-04 under an appropriate diagnostic code. 38 C.F.R. §§ 4.118, DCs 7801-7805.

Evidence relevant to the current level of severity of the Veteran's left knee surgical scar includes VA examinations conducted in April 2017 and November 2017. These examination reports note a scar of the left knee medial side which was not painful or unstable and did not have a total area equal to or greater than 39 square centimeters which was located on the head, face, or neck. 

In May 2017 correspondence, the Veteran's attorney wrote that the Veteran experienced considerable pain from his left knee surgical scar. Specifically, the Veteran wore a knee brace that rubbed and irritated the scar. Trousers and hiking shorts also rubbed on the scar, causing further soreness, tenderness, and pain. The scar also caused soreness when the Veteran hiked, although the Veteran had stopped hiking due to several impairments. The Veteran also reported that his left knee scar pain was sometimes masked by left knee joint pain. In January 2018 correspondence, the Veteran's attorney wrote that, according to the November 2017 VA examination report, the left knee scar "itches when wearing a knee brace." The Veteran also reported that the knee-brace and his clothing rub the scar and cause pain and tenderness. 

Given the above, the Board finds that the criteria for a 10 percent disability rating for the Veteran's left knee scar have been met. While both the April and November 2017 VA examination reports show that the Veteran's left knee scar is not painful, as early as May 2017, the Veteran has contended that the scar is often painful as it is irritated by the Veteran's knee brace and clothing. DC 7804 provides a 10 percent rating for one or two scars that are unstable or painful. As such, a 10 percent disability rating for the Veteran's painful scar is warranted. 

With regard to the potential for an even higher rating, the Board further finds that a rating in excess of 10 percent is not warranted under the diagnostic codes pertaining to scars, 38 C.F.R. § 4.118, DCs 7800 to 7805, because the record does not show, and the Veteran does not contend, that the left knee scar is deep or nonlinear. The record also does not show that the Veteran has three or more unstable or painful scars or scars with an area or areas of at least 39 square centimeters. 

IV. TDIU Analysis

The Veteran generally contends that he is unable to maintain employment due to his service-connected disabilities.

A total disability rating may be assigned when the schedular rating is less than 100 percent where a Veteran is unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities, provided that, if there is only one such disability, that disability is rated 60 percent or more, or if there are two or more disabilities, there shall be at least one disability rated 40 percent or more and sufficient additional disability to bring the combined rating to 70 percent or more. 38 C.F.R. §§ 3.340, 3.341, 4.16(a).

If a claimant does not meet the aforementioned criteria, a total disability rating may still be assigned, but on a different basis. It is the established policy of VA that all Veterans who are unable to secure and follow a substantially gainful occupation by reason of service-connected disabilities shall be rated totally disabled. Therefore, the rating boards are required to submit to the Director, Compensation Service, for extra-schedular consideration all cases of Veterans who are unemployable by reason of service-connected disabilities, but who fail to meet the percentage standards set forth in 38 C.F.R. § 4.16(a). 38 C.F.R. § 4.16(b). 

In determining whether a Veteran is unemployable for VA purposes, consideration may be given to the Veteran's level of education, special training, and previous work experience, but not to age or any impairment caused by nonservice-connected disabilities. 38 C.F.R. §§ 3.341, 4.16, 4.19 (2016); Hersey v. Derwinski, 2 Vet. App. 91 (1992); Faust v. West, 13 Vet. App. 342 (2000). A Veteran need not show 100 percent unemployability in order to be entitled to a TDIU. Roberson v. Principi, 251 F.3d 1378 (Fed. Cir. 2001).

The Veteran has established service connection for bilateral hearing loss, rated 70 percent disabling; osteoarthritis and osteochondritis of the left knee, rated 30 percent disabling; tinnitus, rated 10 percent disabling; and surgical scar, post-operative residuals, arthrotomy associated with osteoarthritis and osteochondritis of the left knee, rated noncompensable. The Veteran's combined rating for compensation purposes is 80 percent. 38 C.F.R. § 4.25. Therefore, he meets the threshold criteria for TDIU. 38 C.F.R. § 4.16(a). The remaining inquiry is whether he is unable to secure or follow substantially gainful occupation due solely to service-connected disabilities.

A review of the record shows that the Veteran last worked full time in 2005 as a lawyer. As above, the April and November 2017 VA examination reports show that the Veteran's left knee disability affected his employability. Specifically, the April 2017 VA examiner noted that the Veteran's left knee disability impacted his ability to perform occupational tasks. Specifically, it was noted that the Veteran must avoid heavy lifting (more than 25 pounds), avoid stairs and uneven surfaces, and could not use ladders. He was also limited to standing and walking. Also, a March 2017 VA examination report shows that the Veteran's bilateral hearing loss affects his ability to work. Specifically, it was noted that the Veteran had trouble hearing people speak and had to have the speaker repeat themselves often. He also reported trouble hearing when there is any background noise and would have to turn up the volume on the television and/or phone. 

Based on the foregoing, the Board finds that the medical evidence supports a finding that the Veteran's service-connected disabilities make him unemployable. Specifically, the evidence suggests that the Veteran's service-connected left knee disability impacts his ability to maintain physical employment and his service-connected bilateral hearing loss impacts his ability to maintain sedentary employment. Therefore, the Board finds that it is at least as likely as not that the Veteran is unable to secure and follow a substantially gainful occupation by reason of service-connected disability and, therefore a TDIU is warranted. 38 U.S.C. § 1155; 38 C.F.R. §§ 3.340, 3.341, 4.16.

V. Earlier Effective Date Analysis

Generally, the effective date of the award of an increase in compensation is either the date of claim or the dated entitlement arose, whichever is later. 38 U.S.C. § 5110(a); 38 C.F.R. § 3.400(o)(1). The exception to the rule allows for the earliest date as of which it was factually ascertainable that an increase in disability had occurred if the claim was received within 1 year from such date; otherwise, the effective date is the date of receipt of the claim. 38 U.S.C. § 5110(b)(2); 38 C.F.R. § 3.400(o)(2).

By way of history, by rating decision dated in December 2013 the RO granted service connection for bilateral hearing loss and assigned an initial 30 percent disability rating effective July 1, 2013, the date of the Veteran's claim for service connection. The Veteran, arguably, submitted a notice of disagreement as to the December 2013 rating decision later that month but no action was taken on this. On December 15, 2016, VA received a formal claim for a TDIU. In connection with this claim, the Veteran was afforded a VA audiological examination in February 2017. As above, by rating decision dated in April 2017, the RO increased the Veteran's disability rating for the bilateral hearing loss from 30 to 70 percent disabling effective December 19, 2016, the date of the most recent claim for increase.

In the present case, the claim on appeal was received on July 1, 2013. As this appeal stems from an initial grant of service connection for bilateral hearing loss, that date serves as the date of claim. As such it is necessary to determine whether, sometime between July 1, 2013 and December 19, 2016, an increase in the Veteran's bilateral hearing loss became factually ascertainable. To do so, the rating criteria for this disability must be examined. 

Impaired hearing will be considered a disability only after threshold requirements are met. See 38 C.F.R. § 3.385. Once disability is established, levels of hearing loss are determined by considering the average pure tone threshold and speech discrimination percentage scores. 38 C.F.R. § 4.85(b). See Lendenmann v. Principi, 3 Vet. App. 345 (1992) (assignment of disability ratings for hearing impairment are derived by a mechanical application of the rating schedule to the numeric designations assigned after audiometric evaluations are rendered).
 
The provisions of 38 C.F.R. § 4.86 address exceptional patterns of hearing loss. The exceptional patterns addressed in this section are present when the puretone threshold at each of the 4 specified frequencies (1000, 2000, 3000 and 4000 Hz) is 55 decibels or more, or when the puretone threshold is 30 decibels or less at 1000 Hz, and 70 decibels or more at 2000 Hz.

A review of the pertinent medical evidence dated between July 1, 2013 and December 19, 2016 includes VA audiological examinations dated in October 2013, April 2014, and February 2017. The results of the October 2013 VA audiological examination are as follows: 

Puretone Threshold

1000 Hz
2000 Hz
3000 Hz
4000 Hz
Right Ear
45 dB
55 dB
80 dB
85 dB
Left Ear
45 dB
60 dB
70 dB
65 dB

Puretone Threshold Average
Right Ear
66 dB
Left Ear
60 dB

Speech Recognition
Right Ear
56%
Left Ear
72%

Applying the results from the October 2013 VA audiological examination to Table VI yields a Roman numeral value of VIII for the right ear and a Roman numeral value of V for the left ear. See 38 C.F.R. §§ 4.85, 4.86. Applying these values to Table VII, the Board finds that the Veteran's hearing loss was 30 percent disabling at that time. Id. 
 
The results of the April 2014 VA audiological examination are as follows: 

Puretone Threshold

1000 Hz
2000 Hz
3000 Hz
4000 Hz
Right Ear
45 dB
55 dB
90 dB
95 dB
Left Ear
45 dB
60 dB
75 dB
70 dB

Puretone Threshold Average
Right Ear
71 dB
Left Ear
63 dB

Speech Recognition
Right Ear
58%
Left Ear
74%

Applying the results from the April 2014 VA audiological examination to Table VI yields a Roman numeral value of VIII for the right ear and a Roman numeral value of V for the left ear. See 38 C.F.R. §§ 4.85, 4.86. Applying these values to Table VII, the Board finds that the Veteran's hearing loss was 30 percent disabling at that time. Id. 


The results of the February 2017 VA audiological examination are as follows: 

Puretone Threshold

1000 Hz
2000 Hz
3000 Hz
4000 Hz
Right Ear
65 dB
95 dB
105 dB
105 dB
Left Ear
45 dB
65 dB
80 dB
75 dB

Puretone Threshold Average
Right Ear
92.5 dB
Left Ear
66.25 dB

Speech Recognition
Right Ear
32%
Left Ear
48%

Applying the results from the February 2017 VA audiological examination to Table VI yields a Roman numeral value of XI for the right ear and a Roman numeral value of VIII for the left ear. See 38 C.F.R. §§ 4.85, 4.86. Applying these values to Table VII, the Board finds that the Veteran's hearing loss was 70 percent disabling at that time. Id. 

Given the above, the Board finds that an effective date earlier than December 19, 2016 is not warranted for the assignment of a 70 percent disability rating for service-connected bilateral hearing loss. See 38 U.S.C. § 5110(b)(2); 38 C.F.R. § 3.400(o)(2). While the Veteran's claim for an increased rating for bilateral hearing loss has been pending since July 1, 2013, the October 2013 and April 2014 VA audiological examinations show that the Veteran's bilateral hearing loss was properly rated as 30 percent disabling at those times. It was not until the February 2017 VA examination that the Veteran's hearing loss was shown to be 70 percent disabling. As noted above, VA regulations provide that the effective date for increases shall be the "date of receipt of claim or date entitlement arose, whichever is later." 38 C.F.R. § 3.400(o)(1). In this case, there is no indication that the Veteran met the criteria for a 70 percent disability rating until the February 2017 VA examination. While the RO appears to have assigned the December 19, 2016 effective date based on the date of a formal claim for a TDIU rather on the "date entitlement arose" the Board will not disturb this award. 

VI. Timeliness of a Notice of Disagreement

Under 38 U.S.C. § 7105(a), an appeal to the Board must be initiated by an NOD and completed by a substantive appeal (VA Form 9 or equivalent) after a statement of the case (SOC) is furnished to the claimant. See 38 C.F.R. §§ 20.200, 20.201, 20.202, 20.302.

A claimant (or his representative) must file an NOD with a determination of the RO within one year from the date that the RO mailed notice of the determination. 38 C.F.R. § 20.302(a). If an NOD is not filed within the one-year time period, the RO decision becomes final. 38 U.S.C. § 7105(c); 38 C.F.R. §§ 20.200, 20.201, 20.302. An untimely NOD deprives the Board of jurisdiction to consider the merits of an appeal. 38 U.S.C. § 7105(c).

38 U.S.C. § 7105 (d)(3) provides that "questions as to timeliness or adequacy of response shall be determined by the Board of Veterans' Appeals." See also VAOPGCPREC 9-99, 64 Fed. Reg. 52376 (1999). The Board may implicitly or explicitly waive the issue of the timeliness of a substantive appeal. A timely filed NOD, however, is a jurisdictional bar to appellate consideration, and this issue may not be waived. See Percy v. Shinseki, 23 Vet. App. 37, 41 (2009). The Board is bound by the law and is without authority to grant an appeal on an equitable basis. See 38 U.S.C. §§ 503, 7104; see also Harvey v. Brown, 6 Vet. App. 416, 425 (1994).

In the present case, the RO issued a decision on September 18, 2015 that denied an additional allowance based on dependency. Under a bolded heading entitled "What You Should Do If You Disagree With Our Decision," the letter advised the Veteran that he had "one year from the date of this letter to appeal the decision" by completing and returning an enclosed VA Form 21-0958, Notice of Disagreement. Also attached was VA Form 4107, "Your Rights to Appeal Our Decision," which explained the Veteran's right to appeal. Therefore, the Veteran had until September 18, 2016 to complete and return the enclosed VA Form 21-0958. See 38 C.F.R. § 20.302(a).

In correspondence received by VA on September 29, 2015, the Veteran indicated that he disagreed with the decision regarding an additional allowance based on dependency. However, he did not submit a completed VA Form 21-0958, Notice of Disagreement at that time and no action was taken. 

Effective March 24, 2015, VA will only accept issues listed on a timely VA Form 21-0958, (NOD), in cases where the AOJ provides the form for the purpose of initiating an appeal. 38 C.F.R. § 20.201 (2017). Thus, if the decision notice was sent prior to March 24, 2015, then the NOD does not need to be submitted on a VA Form 21-0958. VBA has interpreted this to mean that if the decision notice was sent on or after March 24, 2015, and the decision notice included the form, then the NOD must be submitted on a VA Form 21-0958. See M21-1, I.5.B.1.b.

It was not until May 2017 that the Veteran submitted a completed VA Form 21-0958. At that time, the Veteran wrote that while 38 C.F.R. § 19.24 mandates the filing of VA Form 21-0958 to constitute an actual NOD, this mandatory use of the form is contrary to the form itself, which states "...while special working is not required the NOD must be in terms which can be reasonably construed as disagreement with that determination and a desire for appellate review." See 38 U.S.C. § 7105. A previous attempt to initiate the appeals process was made in September 2015. 

The RO issued an SOC regarding whether a timely NOD was received as to a September 2015 denial of additional allowance based on dependency in July 2017 and the Veteran perfected an appeal as to this issue in August 2017. 

The Veteran and his attorney argue that while 38 C.F.R. § 20.201 requires the use of VA Form 21-0958, 38 U.S.C. § 7105 does not require the use of the form. While the Veteran is correct that 38 U.S.C. § 7105 does not mention the use of VA Form 21-0958, in Sears v. Principi, 349 F.3d 1326 (Fed. Cir. 2003), the Federal Circuit found that there are valid gap-filling regulations which are not in conflict with their corresponding statute(s). While Sears pertains to effective date regulations instead of the timeliness regulation at hand, the Board finds that the reasoning behind the decision in Sears extends to this case, specifically that 38 C.F.R. § 20.201 is a gap-filling regulation that is not in conflict with 38 U.S.C. § 7105.

As above, effective March 24, 2015, VA will only accept issues listed on a timely VA Form 21-0958 in cases where the AOJ provides the form for the purpose of initiating an appeal. 38 C.F.R. § 20.201 (2017). Furthermore, the September 2015 notice letter regarding the Veteran's denial of additional allowance based on dependency included VA Form 21-0958. The pertinent legal authority is clear and specific, and the Board is bound by such authority. The record clearly shows that the Veteran did not file a VA Form 21-0958 with the September 2015 decision within one year of the letter notifying him of such, and the Veteran does not contend otherwise. The Board is bound by the law and is without authority to grant an appeal on an equitable basis. See 38 U.S.C. §§ 503, 7104; see also Harvey v. Brown, 6 Vet. App. 416, 425 (1994).

In light of the foregoing, the Board finds that the Veteran did not file a timely NOD with the September 2015 decision denying an additional allowance based on dependency. Consequently, the appeal as to the timeliness of the NOD is denied. See 38 U.S.C. § 7105; 38 C.F.R. §§ 20.200, 20.302.


ORDER

Service connection for a right eye disability is granted. 

Service connection for a left foot/toe disability is granted. 

Service connection for a left hip disability is granted. 

Service connection for a right hip disability is granted. 

Service connection for a chin laceration is granted. 

Service connection for a lumbar spine disability is granted. 

Service connection for a left 5th finger fracture is granted. 

Service connection for a right knee disability is granted. 

Service connection for a right thumb laceration is granted. 

As the Veteran's initial 10 percent rating under DC 5257 for P.O. Residuals, arthrotomy, left knee remained in effect from August 1955 to July 2013, a period well in excess of the 20 years required for protection of that rating, beginning July 1, 2013 (the date of claim for an increased rating), the Veteran is entitled to two separate ratings for his service-connected left knee disability; the 10 percent rating under DC 5257 (pertaining to recurrent subluxation or lateral instability of the knee) and the ratings under DCs 5260 and 5261 (pertaining to limitation of flexion and extension) through the application of 38 C.F.R. § 4.59 as assigned by the RO in the December 2013 rating decision under DC 5260. 

Prior to April 10, 2017, a disability rating greater than 10 percent for loss of motion due to osteoarthritis and osteochondritis of the left knee is not warranted.

Beginning April 10, 2017, a disability rating greater than 30 percent for loss of motion due to osteoarthritis and osteochondritis of the left knee is not warranted.

The criteria for a separate 10 percent rating, but no higher, for atrophy of the left leg as secondary to service-connected post-operative residuals, arthrotomy, left knee, is granted, subject to the laws and regulations governing payment of monetary benefits.

An initial 10 percent disability rating for surgical scar, status post left knee arthrotomy is granted. 

A TDIU is granted. 

An effective date earlier December 19, 2016 for the assignment of a 70 percent disability rating for bilateral hearing loss is denied.

A May 2017 NOD was not timely to appeal a September 2015 denial of additional allowance based on dependency. 





______________________________________________
R. FEINBERG
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs